IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| ZACHRY ADAM CAUDELL,<br><br>    *Plaintiff,*<br><br>**v.**<br><br>**NEWREZ LLC**, *d/b/a* SHELLPOINT MORTGAGE SERVICING**; PADGETT LAW GROUP; and FEDERAL NATIONAL MORTGAGE ASSOCIATION,**<br><br>    *Defendants.* | **CIVIL ACTION NO.**<br>**3:26-cv-00007-TES** |

## ORDER GRANTING IN PART AND DENYING IN PART SHELLPOINT AND FANNIE MAE'S MOTION TO DISMISS

This case challenges dispossessory actions that, according to Plaintiff Zachry Adam Caudell, escalated to full-blown foreclosure of his property because of inaccurate accounting practices by the above-captioned defendants. [Doc. 10, p. 2]. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and Federal National Mortgage Association ("Fannie Mae") filed a motion to dismiss seeking dismissal of the claims Plaintiff asserts against them in his amended complaint. [Doc. 10]; [Doc. 12]. In that pleading, Plaintiff asserts eight counts, and the question before the Court is whether he pleads sufficient facts to plausibly support them. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007).

First, he asserts violations of the Fair Debt Collection Practices Act (the "FDCPA" or the "Act"), 15 U.S.C. §§ 1692–1692p; a violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2605, and its implementing regulation, Regulation X, 12 C.F.R. pt. 1024; and claims arising under the Uniform Commercial Code. [Doc. 10, ¶¶ 35–40, 42–44, 46–48]; [Doc. 12-3, p. 5]. Next, pled in the alternative, Plaintiff asserts a claim for recoupment. [Doc. 10, ¶¶ 50–52]. And lastly, in addition to his claims for declaratory and injunctive relief, he asserts claims for unjust enrichment, "accounting transparency," and wrongful foreclosure under Georgia law. [*Id.* at ¶¶ 54–56, 58–60]. In support of these claims, Plaintiff alleges the following facts, and where his factual allegations are sufficiently pled and devoid of legal conclusions, the Court, as discussed below, accepted them as true for the purposes of ruling on Shellpoint and Fannie Mae's motion to dismiss.[1]

## **LEGAL STANDARD**

Rule 12(b)(6) must be read in conjunction with the pleading rules set forth in Rule 8, which requires a pleading to "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court reads Rule 8(a)(2) to require that a complaint "contain sufficient factual matter, accepted

---

[1] Defendant Padgett Law Group neither filed a dismissal motion nor joined the one now pending before the Court.

as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The plausibility standard is not analogous to a "probability requirement," but it does require more than a sheer possibility that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 556. A claim is plausible when "the pleaded factual content allows [a] court to draw a reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the facts need not be detailed, they must "raise a reasonable expectation that discovery will reveal evidence" in favor of the plaintiff's claim. *Twombly*, 550 U.S. at 556. The issue to be decided on a Rule 12(b)(6) posture is a limited one: it's not whether the plaintiff will win his case but whether he has provided enough information to "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79; *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984).

Whether a plaintiff can survive a Rule 12(b)(6)-based motion is "a content-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citations omitted). If the plaintiff only alleges "unadorned, the-defendant-unlawfully-harmed-me-accusations," he does not have enough to proceed to discovery. *Id.* at 678 (citations omitted). Further, "labels, conclusions, and a formulaic recitation of the elements of a cause of action" alone are likewise insufficient because every legal conclusion pled must be supported by factual allegations. *Id.* at 678–79 (citations omitted). If there aren't enough factual allegations to

raise a reasonable expectation of relief, dismissal is warranted under Rule 12(b)(6). *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

To decide whether a complaint survives a motion to dismiss, courts use a two-step framework. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citation omitted). The first step is to identify the allegations that are "no more than conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 681). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* "A court decides whether [Rule 8's pleading standard] is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow [it] to reasonably infer that the plaintiff [may be] entitled to the legal remedy sought." *Barreth v. Reyes 1, Inc.*, No. 5:19-cv-00320-TES, 2020 WL 4370137, at *2 (M.D. Ga. July 29, 2020).

Again, "even if doubtful in fact," the Court must follow the cardinal rule of accepting the facts as alleged in a complaint as true. *Twombly*, 550 U.S. at 555, 572; *Iqbal*, 556 U.S. at 678. In accepting the factual allegations as true, courts are to construe the

4

reasonable inferences from them in the light most favorable to the plaintiff. *See Andre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1291 (11th Cir. 2025). "But[,] where the well-pleaded facts do not permit [a] court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In a pro se action, the Court must also construe a complaint more liberally than it would a pleading drafted by a lawyer. *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980); *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003). Even though the impending factual background is largely comprised of quoted language from Plaintiff's amended complaint, the Court is still, of course, cognizant of the leniency he's afforded when it comes to alleging facts. That said, pro se litigants are not exempt from complying with the Federal Rules of Civil Procedure, including Rule 8(a)(2)'s pleading standard. *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("Yet[,] even in the case of pro se litigants[,] this leniency does not give a court license to serve as de facto counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action[.]" (internal citations omitted)), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 706 (11th Cir. 2010); *see also Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) (stating that pro se litigants are "subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure").

Lastly, under the incorporation-by-reference doctrine, district courts may

consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if "the plaintiff refers to certain documents in the complaint," those documents are "central to [a] claim," and the documents' contents are undisputed. *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023) (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). "Evidence is 'undisputed' in this context if its authenticity is unchallenged." *Id.* (citing *Horsley*, 304 F.3d at 1134).

## **FACTUAL BACKGROUND**

Plaintiff characterizes his case as one concerning "a servicing and accounting dispute" based on specific, transaction-level discrepancies; omitted credits; and misleading debt-collection communications. [Doc. 16, p. 1]. On November 18, 2024, Plaintiff executed a Promissory Note[2] encumbering property located at 2358 Troy Smith Road in Monroe, Georgia, in return for a $780,000.00 loan from Eustis Mortgage Corporation. [Doc. 10, ¶¶ 14, 20]; [Doc. 12-2, p. 2]. The Promissory Note, backed by a Security Deed in favor of Eustis Mortgage Corporation with Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee, requires the loan servicer to hold escrow funds and pay those funds "within the times required by" the RESPA. [Doc. 10, ¶ 15]; [Doc. 12-3, p. 4]. The Security Deed also requires the loan servicer to provide an

---

[2] "A promissory note is a contract evidencing a debt and specifying terms under which one party will pay money to another." *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216 (11th Cir. 2012) (first citing *Black's Law Dictionary* 1089 (8th ed. 2004) (defining "promissory note" as an "unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person"); and also citing O.C.G.A. § 11-9-102(a)(64) ("'Promissory note' means an instrument that evidences a promise to pay a monetary obligation . . . .")).

6

accounting to Plaintiff "if there is a surplus of [f]unds held in escrow." [Doc. 10, ¶ 16].

However, when Shellpoint began servicing his loan on December 9, 2024, Plaintiff alleges that in January 2025 Shellpoint started "issu[ing] monthly mortgage[3] statements and default correspondence" stating a "total amount due" and a "delinquency" amount; started itemizing certain amounts related to principal, interest, escrow, and fees; and started providing "due dates and payment instructions" with debt-collection and payment-inducing language. [*Id.* at ¶¶ 17–18]. Plaintiff says these statements and notices "were not purely informational" but "were attempts to induce payment on a disputed and allegedly defaulted debt." [*Id.* at ¶ 19].

Then, between February and August 2025, Plaintiff alleges that Shellpoint's statements reflected increased monthly escrow payments and delinquency amounts "that did not reconcile with [his] documented payment history and prior escrow balances." [*Id.* at ¶ 21]. According to his amended complaint, Plaintiff "does not contend that any third-party payment automatically 'discharged' the [Promissory] Note," but he *does* believe that these mismatched figures were materially affected by "one or more insurance-related transactions" that were not posted to the loan's transaction history that Shellpoint provided to him. [*Id.* at ¶¶ 21, 25]. Although "[a]ny application of payments, insurance proceeds, or [m]iscellaneous [p]roceeds to principal

---

[3] "A mortgage is a type of security interest with real property as the collateral." *Reese*, 678 F.3d at 1216 (first citing *Black's Law Dictionary* 1031 (8th ed. 2004); and also citing O.C.G.A. § 44-14-30 ("A mortgage in [Georgia] is only security for a debt and passes no title.")).

due under the [Promissory] Note will not extend or postpone the due date, or change the amount, of" payments due, Plaintiff claims that the defendants "have not disclosed" certain insurance-related transactions even though he alleges he sent inquiry after inquiry and that their failure to do so is "directly relevant" to whether their statements accurately reflect the "amount due" on the loan. [*Id.* at ¶¶ 20–21]; [Doc. 12-3, p. 7]. Boiled down to it, all Plaintiff wants is an accounting. [Doc. 10, ¶ 26].

"[W]hether [any insurance is] required" by the lender, the Security Deed states that "[a]ny insurance proceeds" "will be applied to restoration or repair" of the property if the lender "deems the restoration or repair to be economically feasible and determines that [its] security [interest][4] will not be lessened by such restoration or repair." [*Id.* at ¶ 20]; [Doc. 12-3, p. 8]. But, if the lender "deems the restoration or repair not to be economically feasible" or if the lender's "security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by" the Security Deed "whether or not then due, with the excess, if any, paid to [Plaintiff]." [Doc. 10, ¶ 20]; [Doc. 12-3, p. 8].

Notwithstanding these provisions, Plaintiff alleges that Shellpoint's "statements and delinquency notices omitted material accounting information necessary to test

---

[4] "[A] security interest is not a promise to pay a debt; it is an interest in some collateral that a lender can take if a debtor does not fulfill a payment obligation. *Reese*, 678 F.3d at 1216 (citing *Black's Law Dictionary* 1384 (8th ed. 2004) (defining a "security" as "[c]ollateral given or pledged to guarantee the fulfillment of an obligation")).

[their] compliance" with the relevant documents, to wit: any insurance proceeds in connection with damage to or loss affecting the property; how, when, and to where those proceeds, if any, were deposited; and a "transaction-level posting trail showing application . . . to escrow, fees, interest, and principal." [Doc. 10, ¶ 22]. According to Plaintiff's allegations, Shellpoint's failure to provide these various accountings means that the escrow figures remain unreconciled, which, in turn, lends to the plausibility "that the amounts represented as 'due' were materially overstated." [*Id.*].

"To the extent," Plaintiff says, "identifiable cash proceeds arising from collection or enforcement of rights associated with the secured obligation" have been received by any of his defendants, "such cash proceeds must be applied in a manner that prevents recovery in excess of the secured obligation and must be accounted for so that [he] is not charged amounts already satisfied."[5] [*Id.* at ¶ 23]. Relying on O.C.G.A. § 9-2-4, Plaintiff says that "a party may not obtain a double recovery for the same injury or obligation" and that "[a]ny amounts received in satisfaction of a secured obligation must reduce the amount recoverable on that obligation." [*Id.* at ¶ 26A (citing *Ga. Ne R.R., Inc. v. Lusk*, 587 S.E.2d 643, 644 (Ga. 2003))].

From March through September 2025, Plaintiff, in addition to claiming that "[he]

---

[5] With respect to this allegation, Plaintiff states in his amended complaint that he "invokes [Uniform Commercial Code] § 9-608 solely with respect to cash proceeds received in connection with enforcement [of the Promissory Note and the Security Deed] and not with respect to foreclosure of real property collateral." [Doc. 10, ¶ 23].

no longer owe[s] the debt because[,] as per the law, it no longer exists once [Shellpoint] sold it to the REMIC Trust"—a real estate mortgage investment conduit, claims he requested the transaction history for all payments and credits related to his loan and an explanation for the escrow deficiencies. [*Id.* at ¶ 27]; *see, e.g.,* [Doc. 1-1, pp. 53, 57, 60, 63, 66, 70, 74, 77–78, 81–82]. Also allegedly included in his requests was whether any third-party credits had been applied to his loan and the identity of the current creditor with the authority to enforce the Security Deed. [Doc. 10, ¶ 27]. In one such correspondence Plaintiff sent to Shellpoint he stated:

> The debt has been nullified, ergo it no longer exists, ergo I no longer owe it. You can send me as many copies of the Security Deed and the Promissory Note as you want, but until you respond to my specific allegations and prove they are wrong then your responses are not worth the paper they are printed on.

[Doc. 1-1, p. 66]. Despite his requests, Plaintiff alleges that Shellpoint "failed to provide a complete and intelligible accounting" and prevented him from being able to dispute the amounts it "asserted as 'due.'" [Doc. 10, ¶¶ 28–29]. "Based on," what Plaintiff coins as an "inflated ledger," Shellpoint "assessed fees, reported delinquency to consumer reporting agencies, and initiated or threatened foreclosure." [*Id.* at ¶ 30].

Shellpoint and Fannie Mae, on the other hand, in their motion to dismiss, contend that Plaintiff's "litany of communications . . . from March through September 2025 . . . do nothing but spout meritless challenges to the [Promissory] [N]ote and authority to foreclose." [Doc. 12-1, p. 4]. In support of their position, Shellpoint and

10

Fannie Mae provide the roadmap to foreclosure through loan documents and supporting materials Plaintiff filed with his original complaint and through evidence they attached to their motion to dismiss. [Doc. 1-1]. Given that these flings are incorporated by reference with Plaintiff's earlier pleading and since Plaintiff did not disavow them for his operative complaint, the Court need not convert the motion before it into one for summary judgment and may consider the filings in a Rule 12(b)(6) arena. *See Hoefling v. City of Mia.*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("[O]ur cases do not permit a district court to consider, on a motion to dismiss, exhibits attached to an earlier complaint that a plaintiff has expressly disavowed or rejected as untrue in a subsequent amended complaint."); *see also* [Doc. 10, ¶ 33].

Even though Plaintiff didn't re-attach or re-file certain exhibits that he filed with his original complaint, the operative pleading "adequately refers to those documents for purposes of incorporation." *Ravan v. Talton*, No. 21-11036, 2023 WL 2238853, at *3 n.5 (11th Cir. Feb. 27, 2023). Eleventh Circuit precedent makes clear—provided, of course, a document is claim-centric and undisputed, *see Horsley*, 304 F.3d at 1134—that it "need not be physically attached to a pleading to be incorporated by reference" when its unquestioned "contents are alleged in a complaint." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). That said, many of the relied-upon exhibits cited and submitted by Shellpoint and Fannie Mae are documents that are central to Plaintiff's claims and undisputed in the sense that Plaintiff doesn't mount any challenge to their authenticity.

11

*Baker*, 67 F.4th at 1276; *Horsley*, 304 F.3d at 1134. With no challenge to these documents' authenticity, the Court considered them in assessing the "life" of the loan in question.

As stated above, Plaintiff executed a Promissory Note "[i]n return for a loan in the amount of $780,000.00" from Eustis Mortgage Corporation on November 18, 2024. [Doc. 12-2, p. 2]. The Security Deed against Plaintiff's real property in Monroe, Georgia, was recorded in Walton County's superior court records on November 22, 2024, at Deed Book 5564, Pages 280–295. [Doc. 12-3, pp. 3, 5]; [Doc. 1-1, pp. 15–30]. The Security Deed was then assigned on April 28, 2025, from Eustis Mortgage Corporation's nominee, MERS, via an Assignment Security Deed to Shellpoint, but according to Plaintiff's amended complaint, Shellpoint began serving the loan as early as December 9, 2024. [Doc. 12-4, p. 2]; [Doc. 1-1, p. 31]; [Doc. 10, ¶ 17]. Then, on July 4, 2025, Plaintiff filed a Release of Mortgage in Walton County's superior court records at Deed Book 5595, Pages 523–524. [Doc. 12-5, p. 2]; [Doc. 1-1, p. 32]. In that filing, Plaintiff wrote:

> BE IT KNOWN: The fiduciary relationship between ZACHRY ADAM CAUDELL and Eustis Mortgage Corp[.] . . . has been concluded, as all beneficial interest in a mortgage loan regarding the herein-described property was sold and/or conveyed by lien holder to the Fannie Mae REMIC Trust 2024-91 (REMIC TRUST).
>
> Accordingly, the mortgage/deed recorded by Eustis Mortgage Corp[.] is cancelled and all lien(s) thereof regarding the aforementioned property are released.
>
> Any secured obligation associated with said mortgage/deed has been satisfied, nullified, or otherwise extinguished, and said mortgage and/or privilege is hereby RELEASED in its entirety. The Clerk of Court, for and within WALTON COUNTY, STATE OF GEORGIA, is expressly authorized

and directed to cancel the recordation of the mortgage and/or privilege filed and recorded on November 22, 2024, # Bk: 5564 Pg: 280–295.

By this release, Eustis Mortgage Corp[.] is divested of all right, title, interest, claim, and/or demand whatsoever to the property commonly identified as:

***2385 Troy Smith Road, Monroe, GA 30656, Lying and being in the 4th District of Walton County, Georgia*[.]**

[Doc. 12-5, p. 2]; [Doc. 1-1, p. 32]. At that time, however, the loan "was in default" according to Shellpoint and Fannie Mae. [Doc. 12-1, p. 3].

After being mailed and receiving notice of a foreclosure sale set to take place on September 2, 2025, Plaintiff's property was foreclosed on and sold to Shellpoint as reflected by a Deed Under Power recorded in Walton County's superior court records at Deed Book 5604, Pages 275–288 on September 15, 2025.[6] [Doc. 12-6, pp. 2–3]; [Doc. 1-1, pp. 49–50]. Following foreclosure, Shellpoint, as the loan servicer of the subject loan, conveyed the property via a Special Warranty Deed to Fannie Mae on November 11, 2025. [Doc. 12-1, pp. 3–4]; [Doc. 12-7, pp. 2–3]; [Doc. 1-1, p. 3 (Plaintiff's allegation that "Shellpoint is a mortgage servicer")].

## DISCUSSION

"Generally, '[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend . . . before [a] district court dismisses the [claim] with prejudice.'" *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir.

---

[6] Plaintiff attached a copy of the foreclosure notice to his original complaint. [Doc. 1-1, pp. 45–48].

2001) (quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991)). "Despite an opportunity to amend his complaint," Shellpoint and Fannie Mae contend that "Plaintiff has still failed to state any claim against [them]" and that with-prejudice dismissals of his claims—in light of the amendment—is appropriate. [Doc. 12-1, p. 6]. Plaintiff filed a brief opposing some but not all aspects of Shellpoint and Fannie Mae's motion to dismiss. [Doc. 16]. Shellpoint and Fannie Mae chose not to file a reply brief.

## A.    Plaintiff's FDCPA Claim Against Shellpoint[7]

First is Count One: Plaintiff's FDCPA claim against Shellpoint. [Doc. 10, ¶¶ 35–40]. There, Plaintiff alleges that Shellpoint violated various provisions of the FDCPA through the use of "false, deceptive, misleading, [and] unfair" means to collect a debt by misrepresenting specific amounts due and by omitting or failing to account for proceeds and credits received in connection with Security Agreement. [*Id.* at ¶¶ 36, 38]. To state a plausible FDCPA claim, "a plaintiff must allege, among other things, (1) that the defendant is a 'debt collector' and (2) that the challenged conduct is related to debt collection." *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1216 (11th Cir. 2012). Not to dull it down too much, but to have a claim under the Fair *Debt* Collection Practices Act, there has to be a "debt." The Act defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the

---

[7] In his amended complaint, Plaintiff specifically asserts his FDCPA claim against Shellpoint and Padgett Law Group. Padgett Law Group, however, as stated above, is not a movant to the motion currently before the Court. *See* n.1, *supra*; [Doc. 12-1, p. 1].

14

money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

Easily enough, Plaintiff admits he's a "consumer," and the Eleventh Circuit has "already held that a homeowner's promissory note, secured by a mortgage on the property," is a debt under the Act. *Daniels v. Select Portfolio Servicing, Inc.*, 34 F.4th 1260, 1266 (11th Cir. 2022) (citing *Reese*, 678 F.3d at 1216); [Doc. 10, ¶ 35]. In addition to a debt, there must be a "communication" from a debt collector bent on collecting that debt. The "monthly mortgage statements" or "periodic statements" and "delinquency notices" Plaintiff mentions in his amended complaint meet the FDCPA's "broad" definition of the word since the Act defines a communication as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2); *Daniels*, 34 F.4th at 1266 (quoting *Hart v. Credit Control, LLC*, 871 F.3d 1255, 1258 (11th Cir. 2017)); [Doc. 10, ¶¶ 10, 18, 20–22].

In other words, to invoke the FDCPA, a communication needs to "sent 'in connection with' an attempt to collect a debt" as opposed to one that only "could have been for informational purposes." *Daniels*, 34 F.4th at 1268 (quoting *Ruth v. Triumph P'ships*, 577 F.3d 790, 798 (7th Cir. 2009)). Bear in mind, though, "a communication can have dual purposes." *Id.* (quoting *Reese*, 678 F.3d at 1217). So, whether a communication is one sent in an attempt to collect a debt depends on "holistically" looking to its

15

specific words as well as its context. *Id.* Here, although Plaintiff hasn't provided copies of the monthly statements from Shellpoint, the relevant pleading standard is one of plausibility—not one of certainty. *Id.* (citing *Iqbal*, 556 U.S. at 679); *see, e.g.*, [Doc. 10, ¶¶ 18–19, 33]. In his amended complaint, Plaintiff states that Shellpoint "used communications that went beyond mere [loan] servicing, including payment-demand language and delinquency notices to induce payment of the amounts claimed due." [Doc. 10, ¶ 35]. Applying the plausibility standard and applying it to a pleading from a *pro se plaintiff*, Plaintiff has sufficiently pled that "Shellpoint's statements and delinquency notices were sent in connection with the collection of a debt" given his allegations that they contained "payment-inducing . . . and collection language" based "on disputed" and "overstated" "sums allegedly due." *Rowe*, 449 U.S. at 9; *Lott*, 350 F.3d at 1160; *Daniels*, 34 F.4th at 1260; [Doc. 10, ¶¶ 4, 10, 18–19, 35]. With that, the only real hiccup for Plaintiff's FDCPA claim against Shellpoint is whether it's considered a "debt collector" for FDCPA purposes.

"The FDCPA . . . is meant to 'eliminate abusive debt collection practices *by debt collectors*, to ensure those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" *Daniels*, 34 F.4th at 1267 (quoting 15 U.S.C. § 1692(e)) (emphasis added).

Shellpoint argues that in order to be held liable for a violation of the FDCPA, it

must be a debt collector within the meaning of the Act. [Doc. 12-1, p. 6 (citing *Reese*, 678 F.3d at 1216, 1218)]. The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, *or* who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). "A plaintiff's ability to properly classify a defendant as a debt collector is critical" since the FDCPA applies only to debt collectors—businesses whose "principal purpose" involves regular debt collection or attempts to collect debts. *Agyeman v. McCurdy & Candler, LLC*, No. 1:12-CV-1051-CAP-JSA, 2013 WL 12099408, at *5 (N.D. Ga. July 16, 2013), *report and recommendation adopted*, No. 1:12-CV-1051-CAP, 2013 WL 12108228 (N.D. Ga. Aug. 7, 2013); 15 U.S.C. § 1692a(6). The Act's definition of debt collector, however, excludes "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another *to the extent* such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii). Put a little more simply, "[t]he FDCPA does not apply to mortgage servicers" that are "attempting to collect any debt . . . which was not in default at the time it was obtained . . . ." *Pignato v. PHH Mortg. Corp.*, No. 2:19-CV-00261-SCJ-JCF, 2020 WL 7382307, at *7 (N.D. Ga. April 17, 2020 (citing 15 U.S.C. § 1692a(6)(F)(iii)).

Notwithstanding the Court's ruling that Plaintiff—as a pro se litigant—plausibly

17

alleged that the monthly statements Shellpoint sent to him constitute communications under the FDCPA, Shellpoint disagrees that it can be deemed a debt collector under the Act. *See* [Doc. 10, ¶ 35], *in connection with* [Doc. 12-1, pp. 6–9]. Shellpoint asserts three reasons—two of which the Court agrees with—why Plaintiff's FDCPA claim against it cannot proceed to discovery. *Iqbal*, 556 U.S. at 678–79 (discussing that the issue to be decided on a Rule 12(b)(6) motion is a limited one: it's not whether the plaintiff will win his case but whether he has provided enough information to "unlock the doors of discovery").

First, Shellpoint contends "[t]he FDCPA ordinarily does not apply to creditors trying to collect their own debt." [Doc. 12-1, p. 7 (quoting *Pinson v. JPMorgan Chase Bank, Nat'l Assoc.*, 942 F.3d 1200, 1209 (11th Cir. 2019))]. A "creditor," under the FDCPA is "any person who offers or extends credit creating a debt or to whom a debt is owed." 15 U.S.C. § 1692(a)(4). Based on this, Shellpoint argues that as a mortgage servicer, it's not a debt collector "unless the underlying loan was in default at the time the mortgage servicer began servicing." [Doc. 12-1, p. 7]. Courts have observed that "'[t]he legislative history of [§] 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned.'" *Comer v. J.P. Morgan Chase Bank, N.A.*, No. 4:11-CV-88 (CDL), 2011 WL 5878400, at *2 (M.D. Ga. Nov. 23, 2011) (quoting *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985)). So, to ultimately

18

prevail on his FDCPA claim against Shellpoint, Plaintiff must establish that he was in default at the time Shellpoint began to service his loan. *Id.* (quoting *Perry*, 756 F.2d at 1208). Where a mortgage servicer assumes a debt that is not in default, it's not considered a debt collector under the FDCPA. *See Perry*, 756 F.2d at 1208. A loan servicer can be a debt collector under the Act *only* when it became the servicer of the loan *after* the loan went into default.[8] *Davis v. Bank of Am.*, No. 2:13-CV-231-WC, 2013 WL 5671049, at *6 (M.D. Ala. Oct. 17, 2013) (citing 15 U.S.C. § 1692a(6)(F)).

Here, Plaintiff alleges that "[o]n or about December 9, 2024, Shellpoint began servicing [his] loan," but his Promissory Note clearly states that his monthly payments in the amount of $5,387.27 didn't start until January 1, 2025. [Doc. 10, ¶ 17]; [Doc. 12-2, p. 2]. By Plaintiff's own admissions through allegations in his amended complaint, his loan couldn't have been in default when Shellpoint began servicing it. Consequently, Shellpoint cannot be considered a debt collector under the FDCPA, and the Court **DISMISSES** Plaintiff's FDCPA claim against it **with prejudice**. *Bryant*, 252 F.3d at 1163 (discussing that leave to amend must be given at least once before a district court dismisses a claim with prejudice).

Second, Shellpoint contends that Plaintiff's allegations in his amended complaint

---

[8] *See also Bailey v. Security Nat'l Serv. Corp.*, 154 F.3d 384, 388 (7th Cir. 1998) (holding that a mortgage servicing company is not a debt collector under the FDCPA where the debt was not in default when it began servicing it); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) (holding that the FDCPA definition of debt collector does not include a mortgage servicing company so long as the debt was not in default at the time it was acquired); *Frazier v. HSBC Mortg. Servs., Inc.*, No. 8:08-cv-2396, 2009 WL 4015574, at *7 (M.D. Fla. Nov. 19, 2009), *aff'd on other grounds*, 401 F. App'x 436 (11th Cir. 2010).

"fail to speak to the principal purpose of Shellpoint's business" and that absent these allegations he cannot plausibly show that the principal purpose of Shellpoint's business "is the collection of any debts" or "regularly [involves the] collect[ion] or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692(a)(6); [Doc. 12-1, p. 8]. Even if Plaintiff's debt had been in default at the time Shellpoint obtained it for servicing—thereby pulling it from the exception in § 1692a(6)(F)(iii)—his allegations still fall short of meeting the definition of debt collector as set forth under the Act. *See Davidson*, 797 F.3d at 1314 ("In contrast to the exclusion at § 1692a(6)(F)(iii), the statutory definition of debt collector applies without regard to the default status of the underlying debt."). While plaintiffs may not simply parrot the statute, Rule 8 requires them to be able to truthfully allege facts that essentially mirror and track statutory language in order to plausibly allege that a business is a debt collector under § 1692a(6). *McFadden v. U.S. Bank N.A.*, No. 8:14-cv-2068-T-35MAP, 2015 WL 10352994, at *5 (M.D. Fla. Oct. 7, 2015).

Even heeding the liberal pleading standard afforded to Plaintiff as pro se litigant, his allegations for debt collector, which are far fewer than those regarding a communication, do not show that the "principal purpose" of Shellpoint "is the collection of any debts" or "the enforcement of security interests," or that it "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owe or due another." 15 U.S.C. § 1692a(6); *Rowe*, 449 U.S. at 9; *Lott*, 350 F.3d at 1160; *see,*

*e.g.*, [Doc. 10, ¶¶ 10, 35]. For this reason, Plaintiff's allegations fail to meet the statutory definition of a debt collector to begin with and supplies the second basis through which the Court **DISMISSES** his FDCPA claim against Shellpoint **with prejudice**. *Bryant*, 252 F.3d at 1163; *Pignato*, 2020 WL 7382307, at *7.

Third, Shellpoint uses Plaintiff's allegation that "the challenged monthly statements and delinquency notices plausibly . . . mis-stated [*sic*] the principal amount due and other key figures" to strike down his FDCPA claim against it. [Doc. 12-1, p. 8 (quoting [Doc. 10, ¶ 39])]. Shellpoint contends that such a "bald, conclusory statement" is insufficient. [*Id.*]. Specifically, Shellpoint argues that Plaintiff "has not described *how* the principal amount due or 'other key factors' were misstated or incorrect . . . ." [*Id.*]. Despite making such an argument, Shellpoint certainly recognizes Plaintiff's allegation that the misstated figures depended on or were materially affected by "one or more insurance-related transactions." [*Id.* (quoting [Doc. 10, ¶ 21])]. This allegation, though, according to Shellpoint is "baseless" since "there was never any . . . insurance claim for the subject property[,] and Plaintiff does not assert any . . . insurable loss."[9] [*Id.*]. This, however, will not and cannot supply a reason the Court dismisses Plaintiff's FDCPA claim against Shellpoint under Rule 12(b)(6).

---

[9] Or perhaps the insurance-related transactions were associated with that portion of Plaintiff's escrow payment designated for insurance premiums. Or perhaps they relate to the amount of insurance premium paid at closing. We just don't know. But, what we do know is that a proper and detailed accounting should handle those concerns one way or the other.

At its core, Shellpoint's third argument against Plaintiff's FDCPA claim toes the line of asking the Court to discredit or disbelieve his factual allegations within the amended complaint. In short, to violate the legal standard set out above. Shellpoint argues that Plaintiff's allegation is "non-descript," but Plaintiff explains that he "pleads these insurance-related transaction facts on information and belief because [Shellpoint and Fannie Mae] control the claim file(s)." [Doc. 12-1, p. 8]; [Doc. 10, ¶ 21]. In its motion to dismiss, Shellpoint even characterizes Plaintiff's amended complaint as "offer[ing] a wide variety of reasons" why his delinquency amounts did not reconcile with his 'documented payment history,'" and the Court is required to accept an allegation that "contain[s] sufficient factual matter. . . as true[.]" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); [Doc 12-1, p. 8 (quoting [Doc. 10, ¶ 21])]. So, banked heavily on Plaintiff's status as a pro se litigant, his "wide variety of reasons" for potentially mismatched delinquency and payment amounts included in his amended complaint contain enough factual heft and would have shoved his FDCPA claim through to discovery for further factual development *had* Shellpoint, as discussed above, properly fit the Act's definition of debt collector. *Rowe*, 449 U.S. at 9; *Lott*, 350 F.3d at 1160; *Johnson v. Oconee Ctr. Cmty. Serv. Bd.*, No. 5:24-cv-00208-TES, 2024 WL 4392378, at *5 (M.D. Ga. Oct. 3, 2024); [Doc. 12-1, p. 8]; [Doc. 10, ¶¶ 21–22]. Since, however, Shellpoint cannot be considered a debt collector as defined by § 1692a(6) under the timeline alleged in the amended complaint, Plaintiff's FDCPA claim against it must be

**DISMISSED with prejudice**. 15 U.S.C. § 1692a(6); [Doc. 10, ¶ 17]; [Doc. 12-2, p. 2].

      **B.**      <u>**Plaintiff's Claim for Violations of RESPA and Regulation X**</u>

In Count Two, Plaintiff asserts a claim against Shellpoint for violation of servicer duties under RESPA and its corresponding regulation, Regulation X. [Doc. 10, ¶¶ 42–44]. A borrower can enforce Regulation X through the provisions of § 6(f) of RESPA. *See* 12 U.S.C. § 2605(f) (creating a private right of action for a borrower to sue "[w]however fails to comply with any provision of this section"); *see also* 12 C.F.R. pt. 1024.41(a) ("A borrower may enforce the provisions of this section pursuant to [§] 6(f) of RESPA (12 U.S.C. [§] 2605(f)).").

In this count, Plaintiff alleges that the Security Deed "ties" escrow funds, an accounting of the value of the escrow account, and timely payment of escrow items to RESPA compliance. [Doc. 10, ¶ 42]. Plaintiff points to "Shellpoint's failure to conduct a reasonable investigation and provide accurate accounting information" as the reason he incurred additional fees, couldn't meaningfully mitigate his losses, and was ultimately thrust into foreclosure. [*Id.* at ¶ 44]. To be sure, it appears the $780,000 loan going into default largely provided the quick route to the foreclosure of Plaintiff's home, but that doesn't mean he can't plausibly state a RESPA claim.[10] [Doc. 12-2, p. 2].

---

[10] As Shellpoint and Fannie Mae note, "Plaintiff does not even suggest or allege that he was not in default on his obligations." [Doc. 12-1, p. 15]. While there may not be any such allegation in black and white, that's obviously why Plaintiff is so adamantly demanding an accounting "trail" of his escrow account through his RESPA claim. [Doc. 10, ¶ 22].

RESPA requires mortgage servicers like Shellpoint to reasonably respond to notices of error like the ones Plaintiff alleges he sent. *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016); [Doc. 10, ¶ 27]. Again, these letters, all of which Plaintiff titled, "Reject for Cause," span from March through September 2025. [Doc. 1-1, pp. 53, 57, 60, 63, 66, 70, 74, 77–78, 81–82]. In one of these letters, Plaintiff discusses how a notice "left on [his] property" claiming that Fannie Mae owns his property was "neither true nor accurate." [*Id.* at p. 81]. In another one, Plaintiff tells Shellpoint, "You have been served notice on many occasions that this debt is no longer valid[,] and I am no longer obligated to the debt." [*Id.* at p. 77]. Then, in another one, Plaintiff challenges Shellpoint's "authority [and] ownership of [his] mortgage" and instructs Shellpoint that it is "precluded from any further collection activity and attempts to foreclose." [*Id.* at ¶¶ 70–71]. "Govern yourself accordingly," Plaintiff signs off on each and every letter he sent to Shellpoint. [*Id.* at pp. 53, 57, 60, 63, 66, 71, 74, 78, 82]. In two of his letters, Plaintiff tells Shellpoint that on January 25, 2025, "a forensic audit of [his] property was completed attesting to the separation of the debt obligation and the mortgage agreement constituting fraud committed by the loan originator, Eustis Mortgage [Corporation], and the debt servicer, NewRez/Shellpoint." [*Id.* at pp. 77, 81].

None of these letters, however, detail what Plaintiff alleges he *requested* in his amended complaint. In the amended complaint, he specifically alleges that he requested information regarding "the full loan transaction history," "the application of all

24

payments and credits," the basis for escrow shortages [and] deficiencies,"

"identification and application of any third-party proceeds [and] credits," and "the

identity of the correct creditor [with] authority to collect" on the loan and "enforce" the

Security Agreement. [Doc. 10, ¶ 27]; *see also* 12 C.F.R. § 1024.35(b). While Georgia law

"does not require notice to the debtor of who the current . . . holder [of a security deed]

is," O.C.G.A. § 44-14-162.2 does require that a debtor be made aware of "the individual

or entity with the authority to negotiate and amend or modify the terms of the

mortgage." *Ames v. JP Morgan Chase Bank, N.A.*, 783 S.E.2d 614, 621 (Ga. 2016) (citing

O.C.G.A. § 44-14-162.2).

Generally, Plaintiff's letters—the ones that are currently on the record—speak to

his assertion that "[he] no longer owe[s] the debt because[,] as per the law, it no longer

exists once [Shellpoint] sold it to the REMIC Trust." [Doc. 1-1, pp. 53, 57, 60, 63, 70, 74,

82]. While those letters likely don't constitute the type of correspondence necessary to

require any responsive obligation from Shellpoint, Plaintiff, in his amended complaint,

*alleges* that it's a *fact* that he requested the transaction history for all payments and

credits related to his loan and an explanation for the escrow deficiencies and

information as to whether any third-party credits had been applied to his loan. *Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); [Doc. 10, ¶ 27]. Whether that's true,

time—well, discovery—will tell.

As Shellpoint argues, to state a claim under § 2605 of RESPA, a plaintiff must

25

allege facts to show that he sent Shellpoint what's known as a Qualified Written Request, or "QWR" for short. 12 U.S.C. § 2605(e); [Doc. 12-1, p. 9 (citing *Tonea v. Bank of Am., N.A.*, 6 F. Supp. 3d 1331, 1345 (N.D. Ga. 2014))]. RESPA defines a QWR as "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer," which: (1) requests information relating to the servicing of a loan; (2) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (3) states the reasons for the borrower's belief that the account is in error, or provides sufficient detail to the servicer regarding other information sought by the borrower. 12 U.S.C. § 2605(e)(1)(A)–(B); *see also* 12 C.F.R. § 1024.35(a) ("A notice on a payment coupon or other payment form supplied by the servicer need not be treated by the servicer as a notice of error.").

That said, to state a claim under RESPA for failure to respond to a QWR, a plaintiff must allege facts to show that: (1) the defendant is a loan servicer, (2) the plaintiff sent the defendant a valid QWR, (3) the defendant failed to adequately respond within the statutory period, and (4) the plaintiff is entitled to actual or statutory damages.[11] *Tonea*, 6 F. Supp. 3d at 1345. Here, Plaintiff has done that. Throughout his letters, he mentions that Shellpoint has not "respond[ed] to [his] specific allegations"

---

[11] However, with respect to "any possible damages Plaintiff might suggest in terms of late fees, foreclosure fees, negative credit reporting and foreclosure progression," Shellpoint argues that those "are not due to any alleged RESPA violation, but rather the default on his loan payments and the events that followed." [Doc. 12-1, p. 11].  While that's likely the case, the Court saves this issue for another day given its ruling that Plaintiff has plausibly stated a RESPA claim in his amended complaint.

and that the correspondence Shellpoint was sending to him "[i]n no way pertains to the matters that [he] ha[d] brought to [its] attention." [Doc. 1-1, p. 66]. Under § 2605's interpreting regulation, Regulation X, a QWR "that asserts an error relating to the servicing of a mortgage loan *is a notice of error for purposes of this section*, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request." 12 C.F.R. § 1024.35(a) (emphasis added); [Doc. 10, ¶ 43].

Shellpoint seeks to defeat Plaintiff's RESPA claim by arguing that his "numerous 'Reject for Cause' communications do not constitute a valid QWR or notice of error for purposes on triggering RESPA obligations to respond." [Doc. 12-1, p. 10]. While the Court is inclined to agree—with respect to *those* communications—Shellpoint's efforts to have the Court dismiss Plaintiff's RESPA claim seem to ignore Plaintiff's clear *allegations* that there have been other communications sent.[12] Shellpoint labels Plaintiff's communications as meritless "show me the note" challenges regarding the foreclosure because of the defaulted loan. [*Id.*]. Shellpoint cites to several cases where district courts have rightfully dismissed RESPA claims where plaintiffs merely focus on the validity of the loan. [*Id.* (citing *Perry v. Regions Mortg.*, No. 1:10-CV-1143-JEC-JFK, 2010 WL 11647342, at *7–8 (N.D. Ga. Sept. 27, 2010) (dismissing RESPA claim because alleged

---

[12] While Plaintiff has not placed these alleged communications on the record as he did with his "Reject for Cause" letters when he commenced this action in the Superior Court of Walton County, Georgia, the Court is unaware of any authority requiring a plaintiff to present his evidence up front. All a plaintiff must do at the pleadings stage is allege facts that "allows [a] court to draw a reasonable inference that [a] defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

QWR focused on the validity of the loan))].

Here, though, Plaintiff's amended complaint asserts allegations "grounded in specific, transaction-level discrepancies, omitted credits, and misleading debt-collection communications." [Doc. 16, p. 1]; [Doc. 10, ¶¶ 15–16, 20–23, 27–28 ]. From his amended complaint, Plaintiff is clearly asking—has *been* asking—for an accounting related to his escrow account, and he alleges that Shellpoint has not provided the sought-after transaction-level information. [Doc. 10, ¶ 22]. Plaintiff's allegations may not be to the caliber Shellpoint wants them, but that's why courts must give a significant amount of leniency to pro se litigants and their pleading abilities. *Rowe*, 449 U.S. at 9; *Lott*, 350 F.3d at 1160. Potentially valid claims ought not to be severed prior to discovery simply because a non-lawyer can't draft a complaint like a lawyer.

Contrary to Shellpoint's arguments, Plaintiff appears to be seeking more than an explanation as to the validity of his loan. [Doc. 12-1, p. 10 (citing *Ward v. Sec. Atl. Mortg. Elec. Registration Sys., Inc.*, 858 F. Supp. 2d 561, 574 (E.D.N.C. 2012) (dismissing RESPA claim because alleged QWR focused on the validity of the loan); and then citing *Ghuman v. Wells Fargo Bank, N.A.*, 989 F. Supp. 2d 994, 1006 (E.D. Cal. 2013) (dismissing RESPA claim because alleged QWR did not relate to the *servicing* of the loan)). In fact, Plaintiff specifically argues that his case is *not* launching a "challenge to securitization or note possession," and, in the Court's view of his amended complaint, Plaintiff's allegations sufficiently demonstrate that there have been several communications sent to Shellpoint

raising "classic," specific service-related inquiries about his loan. [Doc. 16, pp. 1, 4]; *see e.g.,* [Doc. 1-1, p. 66 (". . . until you respond to my specific allegations . . . .")]. Since it appears Plaintiff has sent more than his "Reject for Cause" letters, his allegations (at this juncture) plausibly state a RESPA claim, and the Court **DENIES** Shellpoint's efforts to dismiss that claim against it. To be clear, taking Plaintiff's amended complaint as a whole, he adequately claims "Shellpoint failed . . . to conduct a reasonable investigation, . . . correct servicing errors or explain why no error occurred, and . . . provide requested information regarding escrow accounting, transaction history, identity of the creditor, and application of funds" within the time required by federal regulations.[13] [Doc. 10, ¶ 43]; [Doc. 16, p. 4].

### C.   Plaintiff's Claims Against Shellpoint and Fannie Mae Under the Uniform Commercial Code

In opposing Shellpoint and Fannie Mae's motion to dismiss, Plaintiff does not argue they're incorrect in their contention that "[i]t is well established" that the claims he asserts in Count Three under the Uniform Commercial Code only apply to the sale of goods. [Doc. 10, ¶¶ 46–48]; [Doc. 12-1, p. 11]; *see generally* [Doc. 16]. As Shellpoint and Fannie Mae argue, and as Plaintiff apparently concedes, the Uniform Commercial Code "does not apply to transactions involving real property such as [a] mortgage[.]'" *Milner*

---

[13] Plaintiff acknowledges that "the holder on a security deed may exercise the power of sale even without holding the note." [Doc. 16, p. 2 (citing *You v. JP Morgan Chase Bank*, 743 S.E.2d 428, 433 (Ga. 2013) ("[O.C.G.A. § 44-14-64(b)] further supports the conclusion that the deed holder possesses full authority to exercise the power of sale upon the debtor's default, regardless of its status with respect to the note.")).

29

*v. New Am. Funding LLC*, No. 1:23-CV-4411-MHC-JSA, 2024 WL 1957342, at *4 (N.D. Ga. Apr. 1, 2024), *report and recommendation adopted*, No. 1:23-CV-4411-MHC-JSA, 2024 WL 4029896 (N.D. Ga. Apr. 30, 2024). Georgia's Uniform Commercial Code "applies to transactions in goods," and not in real estate. *Mgmt. Assistance, Inc. v. Comput. Dimensions, Inc.*, 546 F. Supp. 666, 676 (N.D. Ga. 1982). So, Plaintiff's invocation of the Uniform Commercial Code "solely with respect to cash proceeds received in connection with enforcement" of the Security Agreement and Promissory Note "and not with respect to foreclosure of real property collateral" do not fall within its scope. [Doc. 10, ¶ 23]; [Doc. 12-1, p. 12]; *see also You v. JP Morgan Chase Bank*, 743 S.E.2d 428, 433 (Ga. 2013) (citation omitted) (holding that a security deed "is not a negotiable instrument and is therefore not governed by Article 3" of the Uniform Commercial Code). Accordingly, the Court **DISMISSES** Plaintiff's claims in Count Three against Shellpoint and Fannie Mae **with prejudice**.

### D.    **Plaintiff's Claim for Recoupment Against Shellpoint and Fannie Mae**

Next, Plaintiff asserts a claim for recoupment in Count Four. [Doc. 10, ¶¶ 50–52]. Plaintiff states that "[t]his claim is pled in the alternative to [his] contract-based claims and applies only to the extent [any of his defendants] retained proceeds or benefits not governed or authorized by the express terms of the [Promissory] Note and Security Deed." [*Id.* at pp. 13–14]. However, claims for recoupment are counterclaims under Georgia law.

"Recoupment is a right of the *defendant* to have a deduction from the amount of the plaintiff's damages for the reason that the plaintiff has not complied with the cross-obligations or independent covenants arising under the contract upon which suit is brought." *Burnham v. Cooney*, 593 S.E.2d 701, 704 (Ga. Ct. App. 2004) (citing O.C.G.A. § 13-7-2) (emphasis added). A counterclaim for recoupment is an implication from a *defendant* that a plaintiff has a cause of action and an assertion that the defendant "has [a] counter cause of action growing out of [a] breach of some other part of same contract on which plaintiff's action is founded . . . ." *Id.* (citation omitted). For these reasons, the Court **DISMISSES** Plaintiff's claim for recoupment **with prejudice**.

### E.    Plaintiff's Claims for Declaratory and Injunctive Relief Against Shellpoint and Fannie Mae

In Count Five, Plaintiff requests declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201–2202. [Doc. 10, ¶¶ 54–56]. Within Count Five, Plaintiff requests three things. First, he seeks a declaration that all named defendants "must account for and apply all cash proceeds received in collection or enforcement" of the Security Deed. [*Id.* at ¶ 55]. Second, Plaintiff seeks a declaration that each of his defendants "are limited to 'one satisfaction' and may not recover more than the secured obligation in the aggregate." [*Id.*]. And third, Plaintiff "seeks preliminary and permanent injunctive relief to halt foreclosure [and] dispossessory steps pending correction of the account and adjudication of the correct amount owed." [*Id.* at ¶ 56]. As to Plaintiff's third request—his request for temporary and permanent

31

injunctive relief—Shellpoint and Fannie Mae's motion to dismiss is **GRANTED**. As to

Plaintiff's first and second requests for declaratory relief, however, their motion is

**DENIED**.

With respect to Plaintiff's request that the Court "halt" foreclosure and

dispossessory proceedings, he has not shown that he is entitled to any preliminary or

permanent injunctive relief. [*Id.*]. To start, dispossessory actions are unequivocally

authorized by Georgia law. O.C.G.A. § 44-7-49. As to requests for temporary injunctive

relief, in the Eleventh Circuit,

> [a] federal court may grant a temporary restraining order . . . only if the
> movant establishes that (1) he has a substantial likelihood of success on the
> merits, (2) he will suffer irreparable injury unless the injunction issues, (3)
> the injunction would not substantially harm the other litigant, and (4) if
> issued, the injunction would not be adverse to the public interest.

*Goldstein v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-00027-TES, 2025 WL 581333, at *2

(M.D. Ga. Feb. 20, 2025) (quoting *Long v. Sec'y, Dep't of Corrs.*, 924 F.3d 1171, 1176 (11th

Cir. 2019)). First, as to the relevant claims on which Plaintiff would need to establish a

likelihood of success on the merits, he cannot, as explained herein, make such a

showing. Second, Plaintiff's property has already been foreclosed upon. Thus, the

irreparable injury Plaintiff seeks to prevent transpired when his property was sold on

the courthouse steps on September 2, 2025. [Doc. 12-6, pp. 2–3]. So, to the extent Plaintiff

seeks to have the Court to reverse that injury, that is not the purpose of a temporary

restraining order. Granting him any temporary injunctive relief, at this point, would

undoubtedly flip the status quo, and relief that alters the status quo as opposed to maintaining it is routinely denied by courts. *Goldstein*, 2025 WL 581333, at *2 (first citing *Ludy v. Dozier*, No. 1:18-CV-165 (WLS), 2019 WL 13434824, at *1 (M.D. Ga. Oct. 25, 2019); and then citing *Wade v. Nat'l Collegiate Athletic Ass'n*, No. 2:24-cv-196-TMB-RP, 2024 WL 5212665, at *3 (S.D. Miss. Dec. 23, 2024)). Such an affirmative request falls outside the bounds of temporary injunctive relief. *Id.*

As to Plaintiff's requests seeking a declaration that all of his named defendants "must account for and apply all cash proceeds received in collection or enforcement" and "are limited to 'one satisfaction' and may not recover more that the secured obligation in the aggregate," the Court holds them in **ABEYANCE** until further factual development on his RESPA claim and his contract-based claim for "accounting transparency." [Doc. 10, ¶¶ 55, 60]. However, to the extent Plaintiff asserts his request for a declaratory judgment as an independent cause of action under the Declaratory Judgment Act, he may not do so. "[The Declaratory Judgment Act] does not provide an independent cause of action or theory of recovery." *Foley v. Orange Cnty.*, No. 6:12–cv–269–Orl–37KRS, 2012 WL 6021459, at *8 (M.D. Fla. Dec. 4, 2012). "Declaratory judgments and injunctions are equitable remedies, not causes of action." *Feingold v. Budner*, No. 9:08-cv-0539-TKH, 2008 WL 4610031, at *2 (S.D. Fla. Oct. 10, 2008). Lastly, the Court clarifies that its ruling with respect to any potential *declaratory relief* for any potential RESPA violation is intertwined with Plaintiff's damages, if any, that come

about as a result of an accounting based on a breach-of-contract theory. *See* Section G, *infra*.

F.     **Plaintiff's Claims for Unjust Enrichment Against Shellpoint and Fannie Mae**

With that, all that remains for discussion are Plaintiff's contract-based claims. The first, unjust enrichment in Count Six. [Doc. 10, ¶¶ 58–59]. Plaintiff alleges that Shellpoint and Fannie Mae's retention of proceeds and credits "while simultaneously demanding the same amounts from [him] constitutes inequitable retention of benefits and supports equitable relief preventing double recovery." [*Id.* at ¶ 58]. In defense of this claim, Shellpoint and Fannie Mae argue that recovery based on a theory of unjust enrichment is not "available when an express contract exists governing all the claimed rights and responsibilities of the parties." [Doc. 12-1, p. 12 (quoting *Davidson v. Maraj*, 609 F. App'x 994, 997 (11th Cir. 2015))]. "The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." *Cochran v. Ogletree*, 536 S.E.2d 194, 196 (Ga. Ct. App. 2000). Easily enough, Plaintiff does not refute this in his opposition to Shellpoint and Fannie Mae's motion to dismiss. *See generally* [Doc. 16].

In his amended complaint, Plaintiff did, however, allege that he executed a Promissory Note encumbering his property and that the Promissory Note was "secured by" a Security Deed. [Doc. 10, ¶¶ 14, 20]. The existence of these duly executed contracts forecloses Plaintiff's attempt to recover on a theory of unjust enrichment, and the Court

**DISMISSES** this claim against Shellpoint and Fannie Mae **with prejudice**.

      **G.**      **Plaintiff's Breach-of-Contract Claim Against Shellpoint and Fannie Mae**

Plaintiff's next contract-based claim is one for "accounting transparency" in Count Seven, which by all accounts is just a run-of-the-mill claim for breach of contract. [*Id.* at ¶ 60]. Based on a simple breach theory, that "[t]ransparent and accurate servicing records are essential to determining the correct amount due," Plaintiff alleges that Shellpoint and Fannie Mae's "refusal to provide a reconcilable transaction history prevented [him] from verifying the asserted delinquency and pursuing available loss mitigation options." [*Id.*]. Note, however, that federal regulation establishes certain limitations through Regulation X regarding loss mitigation. First, "[n]othing in [pt.] 1024.41" of Regulation X "imposes a duty on a servicer to provide any borrower with any specific loss mitigation option." 12 C.F.R. pt. 1024.41(a). Second, "[n]othing in [pt.] 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan"— including "the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law." *Id.* Notwithstanding these limitations, Plaintiff's breach-of-contract claim shall also proceed for further factual development since his RESPA claim against Shellpoint and Fannie Mae, predicated on the same basic legal principle—an accounting—survives their Rule 12(b)(6)-based motion to dismiss.

H. **Plaintiff's Claims for Wrongful Foreclosure Against Shellpoint and Fannie Mae**

Finally, in Count Eight, Plaintiff asserts a claim of wrongful foreclosure against Shellpoint and Fannie Mae. [Doc. 10, p. 16]. In his amended complaint, Plaintiff claims that Shellpoint and Fannie Mae "exercised the power of sale without demonstrating lawful authority as secured creditor or [as a] duly authorized agent at the time of notice and sale." [*Id.*]. Put simply, Plaintiff contends that there are "discrepancies between the foreclosing entity and the dispossessory plaintiff." [Doc. 16, p. 5].

Relative to this claim, Plaintiff further alleges that because "no recorded deed transferring title from Shellpoint to Fannie Mae was recorded prior to the filing of the dispossessory action," there is "a defect in [Fannie Mae's] standing" for the dispossessory proceeding which "further evidences unlawful enforcement" of the Security Deed. [Doc. 10, ¶ 31B]. Based on these allegations, Shellpoint and Fannie Mae point out that Plaintiff "takes issue with the fact that the Deed Under Power 'conveyed title to [Shellpoint], yet the subsequent dispossessory proceeding was filed by [Fannie Mae]." [Doc. 12-1, p. 13 (quoting [Doc. 10, ¶ 31B])]. Critical to Plaintiff's claim for wrongful foreclosure, however, is Shellpoint and Fannie Mae's argument that it's a well-settled matter of Georgia law that Plaintiff lacks standing to challenge any assignment of the Promissory Note and its securing Security Deed because, as a "borrower," he is not a party to the assignment. [Doc. 12-1, p. 15 (citing cases)]. In *Ames*, the Georgia Supreme Court clearly held:

36

> What the [borrower] cannot do is dispute the assignment; that may normally be done only by the assignor, because the [borrower] is not a third-party beneficiary of the assignment as a whole and particularly is not intended to directly benefit from the transfer of the power of sale. '[S]tatus as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those not made for that party's benefit.'

783 S.E.2d at 620.

Remember, after Plaintiff's property was foreclosed on, it was sold to Shellpoint. [Doc. 12-6, pp. 2–3]; [Doc. 1-1, pp. 49–50]. Following foreclosure, Shellpoint, as the loan servicer of the subject loan, conveyed the property via a Special Warranty Deed to Fannie Mae; thus, it makes sense that Fannie Mae filed the dispossessory action as the owner of the property. [Doc. 12-1, pp. 3–4, 13 n.4]; [Doc. 12-7, pp. 2–3]. In their efforts to strike down Plaintiff's claim for wrongful foreclosure, Shellpoint and Fannie Mae contend that "[t]he only relevant inquiry for the propriety of foreclosure is that the assignee of the Security Deed conducted the foreclosure sale." [Doc. 12-1, p. 7]. "Under current Georgia law, the holder of a deed to secure debt is authorized to exercise the power of sale in accordance with the terms of the deed even if it does not also hold the note or otherwise have any beneficial interest in the debt obligation underlying the deed." *You*, 743 S.E.2d at 433. In other words, the authority to foreclose doesn't hinge on possession or the ability to prove ownership of an "original" promissory note—all that matters is that there was, as is the case here, a valid assignment. *Horn v. Rushmore Loan Mgmt. Servs. LLC*, No. 1:18-CV-4368-SCJ-JSA, 2019 WL 2306265, at *3 (N.D. Ga. Mar. 19,

2019), *report and recommendation adopted*, No. 1:18-CV-4368-SCJ, 2019 WL 2319436 (N.D. Ga. Apr. 11, 2019). Plaintiff concedes as much via his argument in his opposition brief. [Doc. 16, pp. 2 (citing *You*, 743 S.E.2d at 434), 5 (citing same)]; *see also* n.13, *supra*; *Gray v. Fay Servicing*, No. 5:20-cv-00377-TES, 2020 WL 7130784, at *3 (M.D. Ga. Dec. 4, 2020) (citing *You*, 743 S.E.2d at 430) ("Georgia law clearly authorizes the use of 'non-judicial power of sale foreclosure' as a means of enforcing a debtor's obligation to repay a loan secured by real property.").

The Security Deed, here, clearly states that it "secures" repayment of the loan and "all renewals, extensions, and modifications" of the Promissory Note. [Doc. 12-3, p. 5]. Further, it states, "[f]or this purpose, [Plaintiff] grants and conveys to MERS . . . and to the successors and assigns of MERS, *with power of sale*," Plaintiff's property at 2358 Troy Smith Road. [*Id.*]. Plaintiff, in executing the Security Deed, acknowledged that he "underst[ood] *and agree[d]*" that MERS "holds only legal title to the interests granted by [him] in th[e] Security [Deed], but, if necessary . . . has the right: to exercise any or all of those interests, including, but not limited to, *the right to foreclose and sell*" his property. [*Id.* at pp. 5–6]. So, as discussed above, the Security Deed was assigned from MERS, as nominee for Eustis Mortgage Corporation, to Shellpoint, via the Assignment Security Deed, and Shellpoint conveyed Plaintiff's property to Fannie Mae via the Special Warranty Deed. That assignment, authorized by the terms of the Security Deed, was all

38

that was required for Shellpoint to commence foreclosure under Georgia law.[14] *See*

*Vieira v. Citigroup, Inc.*, No. 1:12-CV-1636-TWT, 2012 WL 6194350, at \*3 (N.D. Ga. Dec.

12, 2012) (discussing what is "apparently standard language" in security deeds does not

render assignments of such secured interests fraudulent under Georgia law). And,

Shellpoint's conveyance of Plaintiff's property to Fannie Mae via the Special Warranty

Deed means that Fannie Mae could lawfully dispossess. Accordingly, the Court

**DISMISSES** Plaintiff's claim for wrongful foreclosure against Shellpoint and Fannie

Mae **with prejudice**.

## <u>CONCLUSION</u>

Expounded on in greater detail above, the Court **GRANTS in part** and **DENIES**

**in part** Shellpoint and Fannie Mae's motion to dismiss as follows. The Court:

- **DISMISSES** Plaintiff's FDCPA claim **with prejudice**,

- **DISMISSES** his claim under the Uniform Commercial Code **with prejudice**,

- **DISMISSES** his claim for recoupment **with prejudice**;

- **DISMISSES** his claim for unjust enrichment **with prejudice**, and

- **DISMISSES** his claim for wrongful foreclosure **with prejudice**.

Plaintiff's RESPA claim as well as his breach-of-contract claim on a theory of

---

[14] Moreover, any challenge to the validity of the assignment fails since, as discussed above, Georgia law "does not require notice to the debtor of who the current security deed holder is, [there is no] mechanism for the debtor to assert claims that the (potentially unnamed) secured creditor does not actually have a validly assigned deed." *Ames*, 783 S.E.2d at 621–22 (citing O.C.G.A. § 44-14-162.2(a)).

"accounting transparency" shall proceed for further factual development. Of course,

tied to those two claims are the limited portions of Plaintiff's requests for declaratory

relief. The Court **LIFTS** the **STAY** of discovery imposed on February 27, 2026. [Doc. 13];

[Doc. 14].

     **SO ORDERED**, this 28th day of April, 2026.

S/ Tilman E. Self, III
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT JUDGE**